UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
: 
In re: : Chapter 11
:
HERITAGE GREEN DEVELOPMENT, L.L.C., : Case No. 17-XXXXX (XXX)
:
Debtor.[1] :
:
----------------------------------------------------------------x

### DECLARATION OF CHARIS C. LAPAS PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2 AND IN SUPPORT OF CHAPTER 11 PETITION

I, Charis C. Lapas, being duly sworn, hereby depose and state as follows:

1. I am the Manager of Heritage Green Development, L.L.C. ("HG" or the "Company," the "Debtor") which is an affiliate of Puble N.V. ("Puble") and Scotia Valley N.V. ("Scotia", together with Puble, the "Affiliated Debtors"), both of which are debtors and debtors in possession in Chapter 11 cases pending before this Court jointly administered under Case No. 17-10747 (MEW).[2]

2. I submit this declaration (the "Declaration") pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules") and in support of the Debtor's voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). I am over the age of 18, competent to testify, and authorized to submit this Declaration in support of the Debtor's Chapter 11 petition described herein.

---

[1] The last four digits of the Debtor's tax identification number is 0740.

[2] The Court and other parties in interest are respectfully referred to my declaration sworn to on March 28, 2017 which accompanied the Chapter 11 Petitions for the Affiliated Debtors for the background concerning those cases. [Docket No. 3 in Case No. 17-10747].

3.  I have served as Manager of HG since May 6, 2002.

4.  I am familiar with HG's property, financial condition, and books and records.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with the beneficial owners of HG and/or their respective representatives, as well as its outside professional advisors.  If I were called to testify, I would testify competently to the facts set forth in this Declaration.

5.  This Declaration is divided into two parts.  Part I of this Declaration (i) provides an overview of HG's business and assets, including its corporate and capital structure, (ii) describes the circumstances leading to the commencement of this Chapter 11 case, and (iii) describes HG's intentions regarding the conduct of this case.  Part II provides the specific information required by Local Bankruptcy Rule 1007-2.

## PART I:  HG's BUSINESS AND ASSETS

**A.    The Chapter 11 Filing**

6.  On the date hereof (the "Petition Date"), HG filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code.  HG continues to manage its property and operate its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee, examiner or official committee of unsecured creditors has been appointed for HG.

**B.    Overview of the Debtor's Businesses and Assets**

  *i.   Company History and Organization;
        Puble, N.V. and Scotia Valley, N.V. Affiliation*

7.  The Company was originally organized as a Virginia limited liability company on May 6, 2002 and was initially known as Heritage Green, LLC.  Effective July 10, 2002, the name of the company was changed to Heritage Green

Development, LLC pursuant to an Amendment to the Certificate of Organization of the Company filed with the Virginia State Corporation Commission.  The original members of the Company were (a) Lapas, L.C, a Virginia limited liability company ("Lapas") and (b) HGD, LC, a Virginia limited liability company.  The Company is in good standing to transact business in the state of Maryland.  A copy of the HG corporate organization chart is attached hereto as Exhibit "A."

8. On or about December 1, 2004, HGD, LC assigned its membership interests in the Company to Blazec Enterprises Limited, a corporation organized under the laws of the Republic of Cyprus ("Blazec").  Blazec was then admitted to the Company as a substitute member.  Presently, Blazec and Lapas are the sole members of the Company with Blazec holding an eighty percent membership interest and Lapas holding a twenty percent membership interest.  On March 31, 2007, Lapas and Blazec entered into the Amended and Restated Operating Agreement of Heritage Green Development, L.L.C. to provide for the operation and management of the Company as a real estate developer.  Charis C. Lapas was named the Manager of the Company and is the Manager of the Company at this time.

9. The shareholder of Blazec is a Republic of Cyprus entity known as Trevorina Holding Limited ("Trevorina").  The holders of the shareholder or equity interests in Trevorina include Thelma Paraskevaides, Christina G. Paraskevaides, Leonie P. Mavronicola and Efthyvoulos G. Paraskevaides (the "Blazec Principals").  The Blazec Principals own the ultimate beneficial interests in Puble and Scotia.

10. The shareholders of Puble are Scranton Establishment, a Lichtenstein entity, ("Scranton") and Skethyl Establishment, a Lichtenstein entity, ("Skethyl") with each holding a fifty percent shareholder interest in Puble.  The Blazec Principals each own a twenty five percent equity interest in Scranton and Skethyl so

3

that the Blazec Principals own one hundred percent of the ultimate beneficial interests in Puble.

11. The shareholders of Scotia are Mantequilla Establishment, a Lichtenstein entity, ("Mantequilla") and Sabelle Establishment, a Lichtenstein entity, with each holding a fifty percent shareholder interest in Scotia. The Blazec Principals each own a twenty five percent equity interest in Mantequilla and Sabelle so that the Blazec Principals own one hundred percent of the ultimate beneficial interests in Scotia.

### ii. *Acquisition of Charles County, Maryland Real Property*

12. On January 9, 2003, the Company purchased and acquired from The Davis Corporation ("Davis") certain real property located in La Plata, Charles County, Maryland (the "Property"). The Property, now known as Heritage Green, originally consisted of three Parcels of land as follows:

- Parcel A containing approximately 621.07 acres of land
- Parcel B containing approximately 140.49 acres of land
- Parcel C containing approximately 268.23 acres of land

13. The Property was purchased from Davis for the purchase price of $13,250,000 with Davis taking back a deferred purchase money note for part of the purchase price in the amount of $8,250,000 (the "Davis Note"). The Davis Note was secured by a deferred purchase money deed of trust that was recorded among the land records of Charles County, Maryland. The Company acquired the Property for the purpose of developing the Property into a mixed use commercial, retail and residential project. At this time, the Property is the sole asset of the Company. The Property has not been developed and is currently unimproved land; however, the Property has been

4

partially planned and subdivided into various phases for development purposes and 292 residential building lots in Phase 1A of the Property.

### iii.    *New York Commercial Bank Loan and Credit Line Facility*

14.    In 2004, the Company refinanced the Property by entering into a revolving credit line facility (the "Credit Facility") with Atlantic Bank of New York ("Atlantic Bank") for the maximum principal amount of $33,000,000.  As a part of such refinancing, the Davis Note was assigned to Atlantic Bank by the noteholder.  The Credit Facility was constituted by way of the Company entering into an Amended and Restated Note and Amended and Restated Deed of Trust in favor of Atlantic Bank which in effect amended and restated the Davis Note and the deferred purchase money deed of trust that secured the Davis Note.  Thereafter, New York Commercial Bank ("NYCB") became the successor in interest to Atlantic Bank.  For purposes hereof, the Credit Facility, and the Amended and Restated Note and the Amended and Restated Deed of Trust in favor of Atlantic Bank are collectively hereinafter referred to as the "NYCB Loan."

15.    The NYCB Loan was personally guaranteed by certain principals of the Company and other affiliate parties.  The NYCB Loan guarantors are:  (i) Charis C. Lapas;  (ii) Christina G. Paraskevaides;  (iii) Leonie P. Mavronicola;  (iv) Efthyvoulos G. Paraskevaides;  (v) the Estate of George E. Paraskevaides, (vi) Lapas L.C.;  and (vii) Blazec Enterprises Limited (collectively, the "Guarantors").

16.    On February 25, 2010, the NYCB Loan was modified and the loan maturity date was extended to December 1, 2011 (the "Third Modification").  The Third Modification also provided for certain loan extension options provided that the Company curtail the NYCB Loan by the amount of $500,000 per extension.  Two

principal payments totaling $1,000,000 were made and the NYCB Loan maturity date was extended to December 1, 2012.

17. A Fourth Modification of the NYCB Loan was entered into by the Company with NYCB on December 1, 2011 that confirmed the principal balance due on the NYCB Loan had been reduced to $19,500,000.

18. A Fifth Modification of the NYCB Loan extended the maturity date of the loan to April 1, 2013.

19. A Sixth Modification further extended the maturity date to July 1, 2013.

20. On July 1, 2013, a Seventh Modification of the NYCB Loan extended the maturity date to October 1, 2013 and confirmed that the outstanding principal balance of the loan was $19,000,000.

21. Thereafter the Eighth Modification of the NYCB Loan extended the maturity date to January 15, 2014.

22. The Ninth Modification of the NYCB Loan extended the maturity date to April 1, 2014 and confirmed that the Company paid $500,000 to NYCB to reduce the loan balance to $18,500,000 and then paid $2,000,000 to reduce the principal balance of the loan to $16,500,000.

23. On March 16, 2016, the Company entered into a letter agreement with NYCB that extended the loan maturity date to July 1, 2016 and confirmed that the principal balance of the loan was $15,500,000.

24. On or about August 2016, the Company ceased making debt service payments to NYCB on the NYCB Loan that matured on July 1, 2016. On October 4, 2016 NYCB filed a Complaint in the Circuit Court for Fairfax County, Virginia against the Company and the Guarantors seeking to collect all amounts due under the NYCB Loan

(the "Complaint"). The Complaint sought the entry of a judgment in the amount of $15,500,000 plus interest, late fees, costs and attorney's fees against the Company and the Guarantors. In March of 2017, the Complaint was dismissed without prejudice as to the Company and the Guarantors.

25. More recently, NYCB stated its intent to foreclose on the Property securing the NYCB Loan by way of a trustee's sale of the Property under Maryland law. The current balance due on the NYCB Loan is $15,500,000 plus interest, late fees, costs and attorney's fees. Pursuant to a letter dated as of September 7, 2017, the Company received notice of the Substitute Trustee's sale to be conducted on September 28, 2017 regarding the Property.

### iv. *Charles County Maryland Unpaid Real Estate Taxes*

26. Because of its liquidity situation, the Company was unable to pay real estate taxes assessed against the Property by Charles County, Maryland ("County") for 2016 and 2017. On May 9, 2017, nine tax sales of the Property were conducted by the County, resulting in the sale of various lots and parcels comprising the Property to third party bidders including the County Commissioner. Pursuant to Maryland and local law, the Company has the right to redeem the parcels sold at the tax sales until November 9, 2017 by paying the delinquent real estate taxes, penalties, interest and the expenses of the tax sale purchasers. After November 9, 2017, the successful tax sale purchasers have the right under applicable Maryland law to begin proceedings in the Circuit Court of Charles County Maryland to foreclose the Company's right of redemption. The approximate total amount of real estate taxes now due the County is approximately $1.3 million to $1.5 million plus penalties and interest. The Company has minimal, non affiliate unsecured or trade debt.

27. The Debtor obtained an appraisal for its Property within the past year which valued the HG Property at approximately $22.3 million. Based on the appraisal, HG's principals believe that the Property has significant equity value and that it presents a range of opportunities for satisfying all non insider claims in full while affording potential equity upside for its principals. HG therefore commenced this Chapter 11 case to protect the potential loss of equity occasioned by the tax lien sales and Foreclosure Sale, and to utilize the tools afforded by the Bankruptcy Code to, *inter alia*, conduct a sale pursuant to section 363 of the Bankruptcy Code from which creditors can be paid pursuant to a Chapter 11 plan the Company intends to propose. In order to market and sell the Debtor's Property, the Debtor will seek to retain a real estate broker familiar with the Property to help facilitate such a sale.

28. HG maintains a business checking bank account with Wells Fargo (the "Bank Account"). The Bank Account is used to pay expenses. As of the Petition Date, the Bank Account has a current balance of approximately $171. HG has no employees; as Manager I handle the administrative needs of HG.

29. In order to fund its operations and maintain the Property during the Chapter 11 case, the Company will rely on loans from its affiliates and/or equity holders. On September 26, 2017, the Bankruptcy Court approved the sales of the commercial properties owned by Puble and Scotia Valley for $44 million and $7.5 million, respectively, and thus the Affiliated Debtors will have the wherewithal to make advances, as the need arises to HG.

**PART II: INFORMATION REQUIRED BY LOCAL BANKRUPTCY RULE 1007-2**

30. Local Bankruptcy Rule 1007-2 requires that a debtor provide certain information, which is set forth below.

31. In response to under Local Bankruptcy Rule 1007-2(a)(3), no committees organized prior to the Petition Date.

32. In response to Local Bankruptcy Rule 1007-2(a)(4), to the best of my knowledge and belief, the Debtor does not have any significant outstanding unsecured or trade debt, Exhibit "B" provides a list of the names of the Debtor's largest unsecured creditors, excluding claims of insiders. In each case, the claim amount listed on Exhibit B are estimated and subject to verification. In addition, the Debtor reserves the right to assert remedies, defenses, counterclaims, and offsets with respect to each claim.

33. In response to Local Bankruptcy Rule 1007-2(a)(5), Exhibit "C" provides the following information with respect to the largest secured claim against HG: the creditor's name and address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), the amount of the claim, a brief description of the claim, and whether the claim or lien is disputed. In each case, the claim amounts listed on Exhibit "B" are estimated and subject to verification. In addition, HG reserves its rights to assert remedies, defenses, counterclaims and offsets with respect to each claim.

34. In response to Local Bankruptcy Rule 1007-2(a)(6), HG's unaudited financial statements showed that: HG has approximately $22 million in total assets and $17.5 million in total, non-insider/affiliated liabilities. A copy of HG's unaudited balance sheet as of August 31, 2017 is attached as Exhibit "G."

35. In response to Local Bankruptcy Rule 1007-2(a)(7), HG's equity is not publicly traded.

36. In response to Local Bankruptcy Rule 1007-2(a)(8), to the best of my knowledge and belief, the Debtor does not have any property in the possession or

custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity.

37. In response to Local Bankruptcy Rule 1007-2(a)(9), Exhibit "D" provides a list of the premises owned, leased, or held under other arrangement from which HG operates its business.

38. In response to Local Bankruptcy Rule 1007-2(a)(10), Exhibit "E" provides the location of HG's substantial assets and the location of its books and records. HG does not have any assets outside the territorial limits of the United States.

39. In response to Local Bankruptcy Rule 1007-2(a)(11), to the best of my knowledge and belief, there is no other action pending against HG or its property where a seizure of the property is imminent other than with regard to the Foreclosure Sale.

40. In response to Local Bankruptcy Rule 1007-2(a)(12), Exhibit "F" provides a list of the names of the individuals who comprise of HG's existing senior management, their tenure with HG, and a brief summary of their relevant responsibilities and experience.

41. In response to Local Bankruptcy Rule 1007-2(b)(1)(2) requires the estimated amount to be paid to HG's employees (not including officers, directors and stockholders) for the 30-day period following the filing of the Chapter 11 petition and the amount paid and proposed to be paid to officers, stockholders and directors and financial consultants for services for the thirty-day period following the Petition Date. HG does not expect to disburse any funds on account of Declarant's expenses or professional fees for the 30-day period following the Petition Date.

To the best of my knowledge and belief, I swear under penalty of perjury that the forgoing is true and correct.

Dated: September 27, 2017

/s/ Charis C. Lapas
Name: Charis C. Lapas, in his capacity as
Manager of Heritage Green Development, L.L.C.